[Crim. No. 5379. First Dist., Div. Two. Mar. 7, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. WARREN M. DeJEAN, Defendant and Appellant.

George H. Link, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Robert R. Granucci, Deputy Attorney General, for Plaintiff and Respondent.

BRAY, J.*—Defendant appeals[1] from judgment of conviction, jury trial having been waived, of violation of section 11501, Health and Safety Code (unlawful sale of narcotics) and of three prior felony convictions.

### Questions Presented

1. Was the case mistakenly submitted on an incomplete transcript?

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1] Although appellant's notice of appeal was filed 13 days after entry of the judgment appealed from, the People have chosen not to press the issue of timeliness for two reasons: ''First, appellant's notice was prepared by himself at the California Medical Facility and dated July 9, 1965, thus suggesting the applicability of the so-called constructive filing doctrine. See *People* v. *Slobodion*, 30 Cal.2d 362 (1947) [181 P.2d 868]. Second, the transcript shows that at the sentencing proceedings, appellant's counsel, upon instruction by the court, promised to file a notice of appeal. . . . See *People* v. *Tucker*, 61 Cal.2d [828] 833 (1964) [40 Cal. Rptr. 609, 395 P.2d 449].''

2. Sufficiency of evidence.

3. Did alleged prior entrapment on September 3 affect the September 5 sale?

4. Was defendant deprived of fair trial by his counsel's stipulation concerning chain of possession of the heroin?

5. Should redetermination of two prior convictions be had concerning waiver of right to attorney?

### Record

On October 29, 1964, an indictment was filed charging defendant and Howard Roberts with sale of heroin on September 3 and an indictment charging them with a similar sale on September 5. It is the conviction of the latter sale that is the subject of this appeal. An amendment to this indictment charged defendant with three prior felony convictions, which defendant admitted. After a six-day jury trial, both defendants were convicted of both offenses. On motion, both defendants were thereafter granted new trials. The court based its ruling upon the ground that the September 3 offense would not have been committed in the absence of entrapment or the use of threats by the police. As for the September 5 offense, the court concluded there was a break in the proof of the chain of possession of the heroin allegedly sold by defendants.

During the retrial Roberts pleaded guilty as to the September 3 indictment of the lesser included offense of violation of section 11500 (possession of heroin) and the September 5 indictment was dismissed as to him.

Thereupon, the prosecutor and defendant DeJean's counsel stipulated that the case against DeJean be submitted to the court on the basis of the testimony heard that day, and the three-volume transcript of the prior trial. It was further stipulated that there was no break in the chain of possession of the heroin subject of the two indictments. After the proceedings had been temporarily suspended for a determination of DeJean's present sanity (the court found him sane), the court found him not guilty of the September 3 offense but guilty of the September 5 offense. The court further found that he had suffered the three prior convictions, which he had admitted, and sentenced him to prison for the term prescribed by law.

### Evidence

Although defendant was acquitted of the offense alleged to have taken place on September 3, 1964, its circumstances need to be detailed in order to understand defendant's contention

that in effect they tainted the offense of September 5, making it ''fruit of the poisoned tree.''

Billye Morrow, a San Francisco police officer acting as an undercover agent to obtain information concerning the narcotic traffic, met one Horace Smith on September 3. Smith had previously told Morrow that he would introduce him to someone who would sell him heroin. Morrow gave Smith $50 to purchase the narcotic from a man whom Smith was to meet in a nearby bar. As they proceeded, a white Buick drove by and Smith jumped in, telling Morrow to wait and that he would return in a few minutes.

Smith did not return and after three to four hours, Morrow and Mrs. Smith set out to find him. At about 4 a.m. they found Smith, who claimed to be ''burned'' because a man named Warren (defendant DeJean), whom Smith had asked to ''cop'' for him, had taken the money, gone into a housing project, and had not returned. Morrow told Smith that he did not believe him, and that if Smith did not get the money back or heroin, Morrow would beat Smith. Mrs. Smith then suggested that they contact a man named Jess who would know where to locate Warren. The group went to Jess' apartment and he agreed to help them find Warren. After driving to various locations in Jess' car, Mrs. Smith spotted defendant Warren DeJean crossing the street. The group left the car and approached defendant.

Mrs. Smith asked defendant what he had done with the money. At first appearing ignorant of what money she was talking about, defendant then admitted he had taken the $50 because Smith owed him at least that much, having previously obtained heroin from him for which he had not paid. An argument ensued; defendant, Jess, Smith and Mrs. Smith all drew knives. A passerby pushed Morrow to the ground. Morrow got up, grabbed a board lying on the ground, and hit the man with it. Morrow and defendant moved away from the crowd and defendant offered to return $12 of the money he had received from Smith. Morrow and defendant then went to defendant's apartment. Defendant went inside, and Morrow waited outside. Defendant returned and gave Morrow $12.

Tregre and Roberts joined Morrow and defendant, and they walked away. Morrow told defendant that he could not go back to ''his man'' without either the money or heroin and asked defendant whether there was anything he could do. Morrow told defendant that if he could ''score'' for him, he would call it even and get the rest of the money from Smith.

Defendant asked Roberts whether he could help Morrow. Roberts thought something could be arranged but that he would have to make a telephone call.

Roberts made a call and then told Morrow to come with him. Morrow, Roberts, Jess, Mr. and Mrs. Smith, and defendant proceeded to a point where Morrow, Roberts and defendant got into Morrow's car. Morrow gave Roberts $30 and defendant gave Roberts some money. Roberts left the car. Defendant asked Morrow whether he used heroin himself. Morrow said that he did not, that he wanted it for an addict who would resell it. When Roberts returned to the car, Morrow asked him if everything was okay, and he replied that it was. Defendant then said, "I told you everything was going to be all right." The three men then drove to a place where Roberts removed a red balloon from his clothing and poured the contents, a grayish-brown powdery substance, onto a piece of paper. After Roberts cut up the substance with a knife, defendant folded a small portion of it into a bindle and handed it to Morrow. The contents of the bindle were subsequently analyzed and found to be heroin.

On September 5, Morrow met defendant and asked him whether he could get him a "25¢ bag" which is equal to a half a spoon of heroin. Defendant told Morrow to wait, and walked over to Roberts, who was standing nearby. After defendant and Roberts talked briefly, they approached Morrow. Roberts asked him what he wanted. Morrow repeated his request for a "25¢ bag." The three men then got into Morrow's car and ultimately stopped at a hotel. Roberts went into it, defendant and Morrow remaining in the car discussing defendant's habit and that of the person for whom Morrow and defendant purported to be buying. Tregre came out of the hotel and defendant asked him if he had seen Roberts. Tregre replied, "That is what I am out here for." Tregre asked Morrow what he wanted and Morrow replied a "25¢ bag." Tregre then removed a small red balloon containing heroin from his mouth and gave it to Morrow in exchange for $25.

Defendant did not testify.

Roberts testified at the first trial to the effect that defendant and he had participated in the September 3 sale only because Morrow threatened and intimidated them. Roberts claimed that he first became involved in the September 3 events when he observed a group of persons engaged in a heated argument. Defendant, whom Roberts knew, was sur-

rounded by several persons with knives in their hands and who were threatening defendant, demanding money. Smith was one of the persons holding a knife, and Morrow was standing nearby. When defendant told Smith he did not have the money, the latter replied that it was Morrow's money, that he had a pistol and was demanding the money be returned and that he (Smith) had to get it back. Roberts then interjected himself into the conversation and suggested to defendant that he give them the money, if he had it, because it looked like they meant business. Morrow then asked Roberts what he had to do with it. Roberts replied that he was not involved at all but was a friend of defendant whom he did not want to see get in trouble. After further discussion Morrow struck Roberts on the neck with a stick.

Morrow continued to insist upon the return of the money or some other "consideration." After Morrow had threatened to take care of defendant and had told Smith to take care of Roberts, defendant made a brief trip into his apartment and then returned. Morrow again stated that he wanted his money or narcotics and told defendant that he was not playing and if defendant could help him, defendant would be helping himself. Defendant then asked Roberts if he could do anything but Roberts said that he did not want to get involved. However, when Morrow told him that he was already involved, Roberts agreed to help him look for narcotics. Out of Morrow's hearing, defendant and Roberts agreed to attempt to discourage Morrow by leading him on a wild goose chase.

Defendant, Roberts and Morrow then drove to various areas in Morrow's car, although Roberts initially pretended that he was unable to locate a narcotics seller. Morrow became increasingly more desperate and finally threatened to kill defendant and Roberts as it would only mean "two dead addicts." Roberts then obtained some heroin and sold it to Morrow.

As to the alleged sale on September 5, Roberts relied upon an alibi defense, claiming that he had spent the entire day at home and that because of a swollen ankle he could not walk.

### 1. *Transcript.*

The instant case was submitted to the trial court for decision, as above noted, upon the record of the prior trial. The prosecutor described this record as consisting of "three volumes of the previous trial in this matter in Department 11 proceeding, December 29, January, '64, January 5th, 1965 and January 8, 1965." He neglected to refer to later trial dates, the proceedings of which are in the three volumes. The

volumes in question were marked as People's Exhibit 3 and were received in evidence pursuant to the stipulation of the parties. Appellant now contends that the case was mistakenly submitted upon an incomplete transcript because the prior trial did not conclude on January 8, 1965 and a great deal of evidence favorable to appellant was produced on January 12, 14 and 15, 1965.

Appellant's contention relative to the incompleteness of the record before the lower court is totally without merit. The three volumes which were admitted into evidence as People's Exhibit 3 have been forwarded to this court. The second and third volumes include transcripts of the proceedings held on January 12, 14 and 15, 1965. The clerk's minutes of May 21, 1965 state, "The defendant DeJean submitted the cause on the three volumes of the transcript of the trial previously held in Department No. 11 of the Superior Court, starting December 29, 1964."

2. *Sufficiency of Evidence.*

■ Defendant concedes that one who aids and abets in the commission of a crime is guilty as a principal. (*People* v. *Mays* (1962) 205 Cal.App.2d 798, 802 [23 Cal.Rptr. 605].) The prosecution is not required to demonstrate that defendant himself did the prohibited acts to sustain a conviction. (*People* v. *Dalton* (1959) 172 Cal.App.2d 15, 21 [341 P.2d 793].)

■ "This court will assume the existence of every fact and every inference which the judge could reasonably have deduced from the evidence. [Citations.] Unless the circumstances of the case and the conduct of the accused are such that upon no hypothesis is there sufficient evidence (circumstantial or otherwise) to sustain the judgment by the trial court, the judgment will be affirmed. [Citations.]" (*People* v. *Powell* (1960) 187 Cal.App.2d 709, 712 [10 Cal.Rptr. 116].)

■ The evidence is reasonably sufficient to support the implied finding that defendant aided and abetted in the sale by Roberts to Morrow on September 5.

Morrow, in language commonly used in the narcotics traffic, asked defendant if he could get him a 25-cent bag of heroin. Telling Morrow to wait, defendant walked over to Roberts and had a conversation with him. A reasonable inference is that defendant told Roberts what Morrow wanted. Defendant and Roberts returned to Morrow and Roberts asked him what he wanted. Morrow repeated his request for heroin. Roberts, defendant and Morrow drove to a hotel, Roberts went in and

sought Tregre. When Tregre joined defendant and Morrow, defendant asked him if he had seen Roberts. Tregre said that was why he was out there. Tregre then delivered the narcotics to Morrow. Before Tregre arrived, defendant and Morrow had been talking about defendant's habit and the habit of the person for whom Morrow and defendant purported to be buying. This evidence was sufficient to support a determination that defendant, Roberts and Tregre were engaging in a joint scheme culminating in the sale to Morrow, and that defendant was aiding and abetting in the sale.

The circumstances here are quite similar to those concerning the first count in *People* v. *Perez* (1958) 162 Cal.App.2d 650 [328 P.2d 512]. There the narcotics officer approached Perez in a cafe and inquired " 'if he had anything,' " to which Perez replied that he did and asked the officer how much he wanted. The officer replied that he wanted half a gram. Perez then pointed to one Rivera and told the officer to go to a designated liquor store and wait for Rivera. The officer did as directed; Rivera arrived later and gave the officer a bindle for $12. Perez did not accompany the officer to purchase the narcotics nor did he personally receive any money from the officer. The court held that the evidence was sufficient to establish Perez' guilt.

### 3. *The Alleged Prior Entrapment.*

Defendant contends that the evidence shows that he was at least as active a participant in the September 3 sale as he was in that of September 5, and that the trial court's finding that he was not guilty of the first sale must of necessity have been based upon the fact that the first sale would not have occurred in the absence of entrapment or other unlawful conduct on Morrow's part.[2] Defendant then contends that the second sale was as a matter of law the result of coercive conduct by the police.

 This court must indulge in all reasonable presumptions in favor of the rulings of the trial court and the judgment, and hence must determine that the trial court found defendant guilty of participating in the second sale after it had given due consideration to the circumstances surrounding the first sale and had determined that such sale was not affected by entrapment or other illegal police conduct.

 Assuming that the first sale was due to illegal action

[2]Defendant also contends that the granting of a new trial after conviction at the first trial was based upon a determination of improper action by the officer at the first sale.

of Morrow,[3] the two sales were separate and distinct transactions and there was no carry-over from the first to the second. The record shows that at the first sale Morrow agreed to "call it even" if he got the heroin. He did get it. There is no evidence that at the second approach, when Morrow asked defendant if he could get him a 25-cent bag of heroin, there was any threat or coercion involved nor any reason why defendant, if he was not interested in a sale, could not have replied that he was unable to comply with Morrow's request. Under such circumstances, the trial court was clearly justified in concluding that the second sale was consummated at a time when defendant no longer had any reason to be intimidated by Morrow. Nor was there any entrapment. It has been held time after time that where the officer poses only as a willing buyer and the accused was ready and willing to make the sale, there is no entrapment. (*People* v. *Munoz* (1961) 198 Cal.App. 2d 649, 656 [18 Cal.Rptr. 82]; *People* v. *Mays* (1962) 205 Cal.App.2d 798, 801 [23 Cal.Rptr. 605].)

Here, Morrow used no persuasion to get defendant to arrange the sale. He merely asked defendant for heroin and defendant immediately summoned his confederate, who in turn told Tregre to deliver the contraband to the officer. ██ "The claim of entrapment must also fail where the officer uses no more persuasion than is necessary for an ordinary sale, and the accused is ready and willing to make the sale." (*People* v. *Moraga* (1966) 244 Cal.App.2d 565, 568 [53 Cal.Rptr. 563].)

██ "Entrapment is a positive defense as to which a defendant asserting it has the burden of showing that he was induced to commit the act for which he is on trial [citations]." (*People* v. *Cordray* (1962) 209 Cal.App.2d 425, 430-431 [26 Cal.Rptr. 42].) In that case, the court held that the fact that defendant was "induced" to obtain a marijuana cigarette on Wednesday did not taint and thereby constitute the defense of entrapment to the prosecution for possessing marijuana on Saturday, which was an independent act.[4]

4. *Chain of Possession.*

██ In deciding the motion for new trial after the con-

---

[3] A very good argument can be made for the proposition that it was not. (See *People* v. *Bourland* (1966) 247 Cal.App.2d 76 [55 Cal.Rptr. 357]).

[4] The People make no attempt to rely upon the evidence pertaining to the September 3 sale as tending to prove defendant's guilt of the September 5 sale.

viction of the defendants at the first trial, the court stated that it was granting the motion as to count one (the September 3 sale) because of the action of the police officer and as to count two because of a break in the chain of possession of the heroin by the police. The chain of possession was broken because the police officer who could have filled the break was in the hospital at the time of the first trial. Moreover, the envelope containing the September 5 heroin erroneously showed that it was received on September 4, one day before the sale was made.

At the second trial, defendant's counsel, who was not the defendant's counsel at the time of the first trial, stipulated to the chain of possession. Defendant now contends that by this stipulation he was deprived of a fair trial.

In a declaration filed in this court on augmentation of the record, the counsel who made the stipulation declared that at the time he made it, he did not understand that the order granting new trial of the charge of sale on September 5 had been based on the judge's finding of failure to prove the chain of possession, that he had not noticed the September 4 date on the envelope containing the heroin. He was informed, however, that ''there was some question in the first trial as to the chain of possession.'' He relied on the statement to him of the assistant district attorney ''that any defects in proof of the chain of possession at the first trial could readily be corrected at the subsequent trial. . . .''

In connection with the testimony of the chemist who analyzed the contents of the envelope, the writing placed on it by Inspector Logan (the officer who was ill at the time of the first trial) was read into the record, ''September 4th '65 at 4:00 p.m.'' Thereafter defendant's counsel stipulated to the chain of possession. Defendant joined in the stipulation.

Significantly, counsel does not state in his declaration that had he noticed the discrepancy in dates, he would not have stipulated, in view of the assurance given him by the district attorney. Counsel did know that there had been a problem at the first trial concerning the chain of possession and consulted with the assistant district attorney concerning it. Thus, his decision represents an informed choice.

The stipulation is one which the defense counsel had the power to make, even in the absence of defendant's concurrence. (See *People* v. *Williams* (1963) 220 Cal.App.2d 108 [33 Cal.Rptr. 765].) Where the defense counsel stipulated that the white powdery substance taken by the officer was in

fact heroin, "Counsel, on behalf of the defendant, had the right to make such stipulation" (p. 115). (To the same effect, *People* v. *Prado* (1961) 190 Cal.App.2d 374, 376 [12 Cal. Rptr. 141].)

*Brookhart* v. *Janis* (1966) 384 U.S. 1 [16 L.Ed.2d 314, 86 S.Ct. 1245], cited by defendant, is obviously not in point. There, the defendant's counsel, over the objection of his client, agreed to a prima facie trial, where he would neither offer evidence in the defendant's behalf nor cross-examine any of the witnesses for the prosecution. The court held that the counsel did not possess the power to enter what amounted to a plea which "is inconsistent with his client's expressed desire and thereby waive his client's constitutional right to plead not guilty and have a trial in which he can confront and cross-examine the witnesses against him." (384 U.S. 7 [16 L.Ed.2d 319, 86 S.Ct. 1248].)

Defendant does not contend that the substance purchased by Morrow was not heroin or that the envelope was not merely misdated. His only contention that he was denied effective aid of counsel is that by the stipulation cross-examination of Inspector Logan was waived. Under the circumstances of this case, the stipulation agreed to by defendant did not deprive defendant of effective aid of counsel nor deny defendant a fair trial.

*5. Prior Convictions and Waiver of Right to Attorney.*

Defendant was charged with and admitted three prior felony convictions, two of which were for violations of the federal narcotics law. Section 11501, Health and Safety Code, provides that the sentence for a single offense of selling narcotics is five years, with parole permissible after three years in prison. However, where the accused is found to have two or more felony convictions of crimes which would be crimes in California under the narcotics laws, his sentence shall be 15 years to life with no probation or parole until he has served at least 15 years in prison. Thus, the two convictions of violations of the federal narcotics law substantially increased the penalty which defendant will receive in this case.

Defendant contends that these convictions cannot be applied, because he claims that the records in the two prior actions fail to show that he was represented in those actions by counsel or that he knowingly waived his right to counsel. He relies on *In re Woods* (1966) 64 Cal.2d 3 [48 Cal.Rptr. 689, 409 P.2d 913], *In re Tucker* (1966) 64 Cal.2d 15 [48 Cal.Rptr. 697, 409

P.2d 921], and *In re Luce* (1966) 64 Cal.2d 11 [48 Cal.Rptr. 694, 409 P.2d 918], which hold, in effect, that prior convictions may not be used to increase penalties unless it appears that the defendant was represented at the prior convictions by counsel or knowingly waived his right to counsel.

He did not raise this contention in the trial court but raises it for the first time on appeal. No contention is made that he may not do so. (See *In re Woods, supra,* p. 8; *Gideon* v. *Wainright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733].) At defendant's request, the record on appeal was augmented by certain documents pertaining to the two prior convictions and by his declaration under penalty of perjury. As to the first conviction, a document entitled ''Arraignment and Plea with Counsel'' of the United States District Court, Eastern District of Louisiana, shows that on May 31, 1950, defendant ''appeared in proper person and represented by his Counsel of Record, Harry H. Howard, Esq.'' and pleaded guilty to a certain violation of the Harrison Narcotic Act. Another document from the same court, entitled ''Judgment and Commitment'' states in pertinent part that on the 31st day of May, 1950, ''the defendant Warren M. De Jean appearing in proper person, and having been advised of his constitutional right to counsel and having been asked whether he desired counsel assigned by the Court, replied that he did not''; that he had been convicted on his plea of guilty of a violation of the Harrison Narcotic Act.

As to the second conviction, a document from the same court dated July 23, 1952, shows that DeJean, with one other, was arraigned and ''Defendants, waived assistance of counsel'' and entered pleas of guilty of violating the Harrison Narcotic Act. Accompanying this document is another from the same court dated July 24, 1952, entitled ''Waiver by Defendant of Assistance of Counsel'' stating, ''I, De Jean, defendant in the above numbered and entitled proceeding, having been advised of my constitutional right to have the Assistance of Counsel for my defense, hereby declare that I do not desire the Assistance of Counsel and hereby waive my right to have the Assistance of Counsel for my defense.''

Defendant does not deny the signature thereto. A third document from the same court entitled ''Judgment and Commitment'' states in pertinent part concerning DeJean, ''the defendant appeared in person and having been advised of his constitutional right to counsel and having been asked whether he desired Counsel assigned by the Court, replied that he did not.''

Defendant in his declaration does not deny that he waived his right to counsel in the two proceedings. All he said is "In said proceedings or portions thereof, I did not have assistance of counsel, and did not *knowingly* waive any such assistance." (Italics added.) Thus, the question in the case at bench is different from those presented in *Woods, Tucker* and *Luce, supra.* The question here is, where the record shows that after being advised of his constitutional right to counsel, he waived his right thereto, is he entitled to a trial of whether or not he *knowingly* waived his right on the mere conclusionary statement that he did not knowingly waive his right, without the slightest suggestion from him of any fact in support of that conclusion.

In *Woods, supra,* the records of his prior convictions make no reference as to whether he was advised of his right to counsel or that he waived such right. *Woods* contains the statement concerning the matter of waiver of counsel, "a party who does not raise the fact issue by *proper allegations* may be bound by that record" (p. 10). (Italics added.) In that case, Woods' declaration "clearly alleges that he did not waive his right to the assistance of counsel . . ." (p. 10). Surely an allegation as here admitting by failure to deny that the defendant did waive his right to counsel, which merely makes the bald assertion that he did not do so knowingly, "does not raise the fact . . . by proper allegations. . . ."

In *Luce, supra,* the petitioner alleged that his plea of guilty on the prior conviction was made without awareness of his right to counsel or waiver of such right. The record merely stated, " 'Court docket does not show of record that any defense attorney was present' " (p. 12).

In *Tucker, supra,* the records of his prior convictions were silent as to whether the petitioner was represented by counsel, offered counsel or whether he waived the services of counsel.

The raising of an issue as to whether a defendant who waived his right to counsel *knowingly* did so is analogous to the raising of an issue in a petition for habeas corpus on a contention that a judgment of conviction was obtained through fraud and knowing use of perjured testimony. The court in *In re Swain* (1949) 34 Cal.2d 300 [209 P.2d 793], held that to raise these issues the facts upon which the conclusionary allegations are based must be set forth. In that case, the allegations were a little more detailed than in the instant case, but the court determined that they were vague, conclusionary and insufficient to warrant issuance of the sought writ.

The same ruling was followed in *In re Razutis* (1950) 35 Cal.2d 532 [219 P.2d 15], where a petition for the writ of habeas corpus contained merely a general statement that the petitioner's conviction resulted from the deliberate suppression of evidence.

In *People* v. *Nor Woods* (1957) 154 Cal.App.2d 589 [316 P.2d 1010], the court stated concerning a petition to set aside a judgment of conviction, "In such a proceeding, whether it be called a motion to vacate or habeas corpus, we are entitled to and we do require of a convicted defendant that he allege with particularity the facts upon which he would have a final judgment overturned" (pp. 590-591). (See *Lincoln* v. *Fox* (1959) 168 Cal.App.2d 31 [335 P.2d 161], where a superior court judge was sued for damages under then section 1505, Penal Code, for failure to issue a writ of habeas corpus. There the court found that the allegations in the petition were "but conclusions" and applied the above-mentioned rule.)

Every reason that requires allegations of particularity in habeas corpus proceedings applies to a proceeding of the kind at bench. We therefore hold that the mere allegation that defendant did not "knowingly" do so when he waived his right to counsel does not raise an issue of fact so as to require a trial.

Judgment affirmed.

Agee, Acting P. J., and Taylor, J., concurred.

A petition for a rehearing was denied April 6, 1967, and appellant's petition for a hearing by the Supreme Court was denied May 4, 1967.